Robert L. Sterup
BROWN LAW FIRM, PC
315 North 24th Street
Billings, Montana 59101
406-248-2611 telephone
406-248-3128 facsimile
rsterup@brownfirm.com

Pamela D. Bucy
TAYLOR LUTHER GROUP, PLLC
One South Montana Ave., Ste M-2
Helena, Montana 59601
406-441-4871 telephone
pam@taylorluthergroup.com

Karl S. Stern
Kate K. Shih
QUINN EMANUEL URQUHART & SULLIVAN LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
713-221-7000 telephone
713-221-7100 facsimile
karlstern@quinnemanuel.com
kateshih@quinnemanuel.com

*ATTORNEYS FOR LEAD PLAINTIFFS*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| Talen Montana Retirement Plan and Talen Energy Marketing, LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> PPL Corporation, PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., Paul A. Farr, Mark F. Wilten, Peter J. Simonich, and DOES 1-50, <br><br> Defendants. | Case No. CV-18-174-BLG-SPW <br><br><br> **FIRST AMENDED COMPLAINT** |

Plaintiffs Talen Montana Retirement Plan and Talen Energy Marketing,

LLC, (collectively, "<u>Lead Plaintiffs</u>"), on behalf of themselves and all other

creditors of Talen Montana, LLC (f/k/a PPL Montana, LLC) ("<u>PPL Montana</u>" or
"<u>Talen Montana</u>"), bring this Class Action Complaint against Defendants PPL
Corporation ("<u>PPL</u>"), PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL
Energy Funding Corp., Paul A. Farr, Mark F. Wilten, Peter J. Simonich,  and
DOES 1-50 (collectively, "Defendants").  Lead Plaintiffs allege as follows:

## I.    SUMMARY OF THE ACTION

1.    This case arises out of yet another chapter in Montana's long history
of out-of-state corporations exploiting Montana's valuable resources, shipping the
profits out of state, abandoning operations in the State, and attempting to shift
responsibility to the State to clean up those abandoned operations.  Here, the
valuable resources were power generating assets in Montana—assets that the
Montana Power Company's ("<u>MPC</u>") ratepayers had bought and paid for through
regulated rates over the last century.   In December 1999, after Montana
deregulated its electricity market, PPL, a Pennsylvania-based utility, acquired
MPC's generating assets in Montana.  PPL Montana was the entity PPL used to
acquire the assets.

2.    With the Montana assets in hand, PPL took full advantage of
historically high electricity prices that followed deregulation of Montana's electric
power market, extracting substantial profits from its Montana operations, including
from Montana electricity customers through energy sales to MPC and later

NorthWestern Corp. ("NorthWestern"), another Montana utility.   PPL then transferred those profits from PPL Montana to PPL and its affiliates in Pennsylvania—totaling at least $325 million through 2012.

3.      By 2012, however, PPL had exhausted its ability to profit legitimately from PPL Montana.  The electricity market in the Northwest had weakened, and PPL Montana was no longer contributing significant profits to PPL.  In fact, PPL Montana was at best a break-even operation with a deteriorating financial outlook. Moreover, it faced significant future liabilities due to environmental remediation obligations primarily connected to its coal-fired assets.

4.      At the same time, PPL needed money for operations outside of Montana.   In 2010 and 2011, PPL had taken on significant debt to fund approximately $13 billion in acquisitions in Kentucky and the United Kingdom. Unwilling to deal with the financial stress from declining Montana profits and the debt burden from these acquisitions by cutting its dividend or issuing additional shares (which would have imposed a burden on PPL shareholders, including its officers and directors), Defendants concocted a scheme to strip improperly the only valuable asset out of PPL Montana by selling its Montana-based hydroelectric facilities and transferring the proceeds of the sale to PPL in Pennsylvania.  In November 2014, PPL Montana completed a sale of its hydroelectric assets to NorthWestern for approximately $900 million and immediately distributed the

proceeds, net of taxes, out of PPL Montana and up through its chain of ownership to PPL and its wholly owned subsidiaries (the "Distribution").

5.     By stripping this value out of PPL Montana and disregarding PPL Montana's substantial liabilities, as asserted herein, Defendants rendered PPL Montana insolvent and unable to fund its significant obligations to the citizens of Montana—both for environmental remediation, as well as obligations to other creditors such as its employees' and former employees' pension plan.  Following the sale, all that remained at PPL Montana to satisfy its obligations to its creditors were its coal-fired assets, which are projected to generate negative cash flows for the foreseeable future and are burdened with substantial environmental and other liabilities.

6.     The scheme to strip all of the real value out of PPL Montana—which was executed by PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., and PPL officers, directors, and employees with control over PPL Montana—constitutes a fraudulent transfer, both actual and constructive.

7.     Until June 1, 2015, PPL Montana was a wholly owned subsidiary of PPL. On June 1, 2015, as the result of a spin-off transaction (the "Spin-Off"), PPL Montana became a subsidiary of a new company, unaffiliated with PPL, called Talen Energy Corporation ("Talen") and was renamed Talen Montana shortly

thereafter. PPL-appointed managers and officers, however, dominated and controlled Talen Montana until December 6, 2016.

8.     This action is brought on behalf of creditors of PPL Montana (now Talen Montana), whether existing prior to the Distribution or thereafter, to compel PPL to return its ill-gotten gains so that the liabilities of its former Montana subsidiary can be satisfied.  The Lead Plaintiffs are current and contingent creditors of Talen Montana.  They include Talen Montana's qualified pension plan and an affiliate of Talen Montana to which Talen Montana owes money.  Lead Plaintiffs' objective is to ensure that, in all circumstances, sufficient funds are recovered from PPL to resolve Talen Montana's affairs and pay its current and future debts, including all monies owed to the State of Montana and its citizens. To this end, Lead Plaintiffs will establish a Montana state remediation trust for any recovery in this action.  Assets from the trust will be deployed to fund and pay for Talen Montana's environmental liabilities and to satisfy Talen Montana's other creditors, such as Talen Montana's qualified pension plan.

9.     Lead Plaintiffs bring this action for: (i) actual fraudulent transfer, (ii) constructive fraudulent transfer, (iii) recovery against subsequent transferees, (iv) civil conspiracy, (v) concert of action, (vi) unjust enrichment, and (vii) constructive trust.   Considering the nature of the conduct and the important interests at stake, Lead Plaintiffs also seek (viii) an award of punitive damages.

## II.   PARTIES

### A.   Lead Plaintiffs

10.   Plaintiff Talen Montana Retirement Plan (the "Plan") is a single-employer, noncontributory defined-benefit pension plan sponsored and funded by Talen Montana.  It covers more than 760 active and former employees of PPL Montana/Talen Montana, more than 630 of whom live in Montana.  A significant number of the active employees live and work in Colstrip, Montana, and a large number of the retirees live in Rosebud County, Montana.  The Plan is an unincorporated association whose participants are principally located in the State of Montana.  It is a creditor of Talen Montana, and was a creditor of PPL Montana at the time of the Distribution.  The vast majority of the Plan's members are residents of Montana.  The Plan's assets are held in the Talen Montana Retirement Plan Trust.

11.   Plaintiff Talen Energy Marketing, LLC is a subsidiary of Talen Energy Corporation.  Plaintiff Talen Energy Marketing, LLC is incorporated in Pennsylvania with its principal place of business in The Woodlands, Texas.  Talen Energy Marketing, LLC is a creditor of Talen Montana.

### B.   Defendants

12.   Defendant PPL Corporation ("PPL") is a Pennsylvania corporation with its headquarters in Allentown, Pennsylvania.  PPL is a Fortune 500 company and one of the largest utility companies in the United States, with subsidiaries

delivering electricity to customers in Pennsylvania, Kentucky, Virginia, Tennessee, and the United Kingdom.  In 1999, PPL formed PPL Montana to own and operate its power generation business in Montana, which included 11 hydroelectric facilities and one storage dam in Montana, a partial interest in the 2,100-megawatt four-unit Colstrip coal-fired power plant in southeastern Montana ("Colstrip"), and the J. E. Corette coal-fired power plant in Billings, Montana ("Corette").  PPL held PPL Montana as an indirect, wholly owned subsidiary from 1999 to 2015.  PPL is the parent holding company of Defendants PPL Capital Funding, Inc., PPL Energy Funding Corp. and PPL Electric Utilities Corp.

13.     Defendant PPL Capital Funding, Inc. is incorporated in Delaware with its principal place of business in Allentown, Pennsylvania.  PPL Capital Funding, Inc. is a financing subsidiary of PPL that provides financing for the operations of PPL and certain subsidiaries.  Debt issued by PPL Capital Funding is guaranteed as to payment by PPL.

14.     Defendant PPL Electric Utilities Corp. is incorporated in Pennsylvania with its principal place of business in Allentown, Pennsylvania.  PPL Electric Utilities Corp. is a public utility subsidiary of PPL engaged in the regulated distribution of electricity.

15.     Defendant PPL Energy Funding Corp. is incorporated in Pennsylvania with its principal place of business in Allentown, Pennsylvania.   PPL Energy Funding Corp. is a subsidiary of PPL and a former indirect parent of PPL Montana.

16.     Defendant Paul A. Farr is a resident of Pennsylvania.  Farr authorized and directed the Distribution as a member of PPL Montana's Board of Managers, and directed its receipt as a senior executive officer of PPL.  Farr was integral to the establishment of PPL's competitive power generation business in Montana in 1999 and equally integral to the Spin-Off in 2015.  Claims asserted herein against Farr are based on his acts and omissions prior to the Spin-Off when he was a member of PPL Montana's Board of Managers.  After the Spin-Off, Farr became Chairman, President, and Chief Executive Officer of Talen, and remained in that role until December 6, 2016.

17.     Defendant Mark Wilten is a resident of Pennsylvania.   Wilten authorized the Distribution as a member of PPL Montana's Board of Managers, and directed its receipt as a senior executive officer of PPL.  Wilten resigned as a manager of PPL Montana after the Spin-Off but continued to work for PPL. Wilten left PPL in 2017.  Claims asserted herein against Wilten are based on his acts and omissions prior to the Spin-Off when he was a member of PPL Montana's Board of Managers.

18.     Defendant Peter J. Simonich is a resident of Montana.   Simonich authorized the Distribution as a member of PPL Montana's Board of Managers and left PPL Montana after the Spin-Off.   Claims asserted herein against Simonich are based on his acts and omissions prior to the Spin-Off when he was a member of PPL Montana's Board of Managers.

19.     DOES 1-50 are potential, additional subsequent transferees of the Distribution that are not known or knowable to Lead Plaintiffs or the Class at this time.

### III.     JURISDICTION AND VENUE[1]

20.     This Court has jurisdiction over Defendants because they engaged in tortious conduct directed at, and with an impact in, the State of Montana, and removed monies from the State of Montana.   Specifically, Defendants caused the sale of PPL Montana's Montana-based hydroelectric assets, and then caused the improper Distribution of the proceeds from that sale out of PPL Montana, leaving PPL Montana without sufficient funds to meet its environmental and other obligations in this State.   Through this conduct, Defendants engaged with PPL

---

[1]     Contemporaneously with this Amended Complaint, Lead Plaintiffs will file a motion to remand this case to Montana state court.   In the instance the United States District Court for the District of Montana does not remand the case and instead finds that it has been properly removed, Lead Plaintiffs allege that the bases for such a decision shall control their allegations of jurisdiction and venue.

Montana, a business that had its principal place of business in Montana at the time of the acts that are the subject of this Complaint.  M. R. Civ. P. §§ 4(B), (D), (F).

21.     This Court has original jurisdiction over the subject matter of this action.  Mont. Code Ann. § 3-5-302(1)(b).

22.     Venue is proper in this Court because Plaintiffs' claims arose, in part, in Rosebud County, the site of the Colstrip facility as well as many of the current and former employees who are participants in the Talen Montana Retirement Plan, and therefore, the tortious conduct that occurred within the Rosebud County was a cause of Plaintiffs' injuries.  Mont. Code Ann. §§ 25-2-115; 25-2-118(2); 25-2-121(1)(b), 25-2-122(1)(b), (2)(a), (2)(b), (3)(a), (3)(b).

## IV.    FACTUAL BACKGROUND

### A.    PPL purchases MPC's generating fleet through PPL Montana in 1999

23.     In 1997, the Montana legislature enacted the Electric Utility Industry Restructuring and Customer Choice Act to deregulate Montana's electric power markets.  In response, MPC put its generation assets up for sale and, in 1998, announced that PPL was the successful bidder.  The sale to PPL, which was a strategic acquisition to grow its merchant power business, was completed in 1999, with PPL acquiring the assets for more than $769 million.

24.     The transaction was a major milestone in the growth of PPL's merchant power business.  The purchase included 11 hydroelectric facilities and a storage dam, and ownership interests in Colstrip and Corette.

**B.     PPL enjoyed substantial profits from PPL Montana until its coal-fired assets began weighing on profitability**

25.     For the decade following PPL's acquisition of MPC's assets, PPL's investment in Montana proved to be very profitable.  Montana's deregulation was closely followed by the California Power Crisis in 2000 and 2001, forcing Montana customers to compete for power with out-of-state customers, including customers in California and the Pacific Northwest.  Deregulation exposed Montana customers to volatile power markets, and power prices in Montana increased as much as 50% over pre-deregulation prices.  As a result, PPL Montana was extremely profitable, resulting in more than $325 million in profits being exported to PPL from 1999 to 2012.

26.     By 2012, PPL's fortunes in Montana began to change dramatically, due to a combination of environmental activism, stricter regulations, increased fuel costs, and competition from subsidized renewable generation.  These fundamental changes increased generation costs at Colstrip and Corette and depressed market prices for electricity in Montana and the Pacific Northwest.

27.     On the regulatory front, Montana passed a re-regulation law in 2007 allowing NorthWestern, the largest regulated utility in Montana and historically

one of PPL Montana's largest customers, to own generation assets in direct competition with PPL Montana.   In 2012, Montana's Renewable Portfolio Standard, which required Montana's public utilities to purchase a proportion of their electricity from renewable sources, increased from a required percentage of five percent to ten percent.   None of PPL Montana's assets, including the hydroelectric facilities, qualified as renewable sources.

28.    The power market in Montana softened as a result of subsidized renewable generation and NorthWestern's reentry into the generation business, causing PPL Montana's profits to plummet.  The problem was particularly acute for the operations of Colstrip and Corette because PPL Montana was required to pay rising prices under long-term coal supply contracts as power prices were dropping.  As a result, Colstrip and Corette's financial projections were negative into the foreseeable future.   While the hydroelectric assets were projected to generate a positive margin, it was not sufficient to offset the negative margin from Colstrip and Corette.

29.    PPL Montana's increasing fuel costs were not its coal-fired operation's only problem.   It was also becoming apparent that the coal-fired operations faced enormous environmental exposure from new regulatory obligations and increased activism.   In 2010, the United States Environmental Protection Agency ("EPA") published an initial draft of its Coal Combustion

Residual ("CCR") rules.  Although the CCR rules would not be finalized and implemented for several years,[2] it was clear at the time that all coal-fired power plants, including Colstrip and Corette, stood to face strict and costly disposal requirements related to coal ash.  The rules promised to be particularly costly as to PPL Montana's Colstrip plant, which had experienced issues related to seepage of coal ash from ponds and into groundwater dating back to MPC's ownership.

30.    That same year, the Sierra Club launched its "Beyond Coal" campaign, the "main objective" of which was to "mobiliz[e] grassroots activists in local communities to advocate for the retirement of old and outdated coal plants and to prevent new coal plants from being built."  The four Colstrip generating units, which were built in the 1970's and 1980's and together comprised the second largest coal-fired plant west of the Mississippi River, were an obvious target for this campaign.

31.    Colstrip's environmental problems only intensified in 2012.  In July of that year, pursuant to an Administrative Order on Consent ("AOC"), which Defendant Simonich signed on Talen Montana's behalf, the Montana Department of Environmental Quality ("MDEQ") imposed extensive closure, remediation, and significant financial obligations on PPL Montana due to historical seepage from

---

[2]    The final version of the CCR rules was issued on December 19, 2014 and published in the Federal Register on April 17, 2015.

Colstrip's ash ponds.  Under the AOC, PPL Montana was required to provide to MDEQ, within five years, financial assurance for the significant costs associated with the future closure, remediation, and monitoring of Colstrip's ash ponds.  In fact, PPL Montana (now Talen Montana) is currently in negotiations with MDEQ regarding these very issues.

32.    Also in July 2012, as part of its Beyond Coal Campaign, the Sierra Club served notice of intent to sue PPL Montana under the Clean Air Act for civil penalties and injunctive relief concerning Colstrip.  A formal lawsuit followed in March 2013.  The remedies sought in the litigation included the installation of additional pollution control equipment at a cost of several hundred million dollars and significant financial penalties.  Ultimately, the lawsuit was resolved in 2016 pursuant to a settlement requiring the closure of two of the Colstrip plant's four units by July 1, 2022.

33.    These same factors affecting the Colstrip plant led to the closure of Corette.  In September 2012, PPL Montana announced that the facility would need to be "mothballed" in April 2015, primarily because of increased compliance costs resulting from new EPA emission-reduction regulations that would render the plant uneconomical.

**C.     PPL needed funds for its other ventures and sought to avoid a dividend cut**

34.     By 2010, PPL started shifting its corporate strategy away from the deregulated, merchant generation business and spent billions of dollars to acquire additional, regulated utilities.  In 2010, PPL purchased a group of regulated utilities in Kentucky for $7.6 billion and, in 2011, purchased a group of regulated utilities in the United Kingdom for $5.6 billion.  PPL incurred substantial debt to fund these acquisitions.  In addition to spending billions of dollars to acquire these utilities, PPL also projected that it would spend more than $15 billion on capital projects between 2011 and 2015, in part to modernize its existing utility operations in Pennsylvania.

35.     In the years following these acquisitions, PPL became financially stressed as the result of declining margins from its merchant power business (including actual operating losses in Montana) and the debt burden from its utility acquisitions and capital spending programs.   Among other things, these circumstances put significant pressure on PPL's dividend.  Publicly, PPL stated that its dividend was supported by regulated earnings. In fact—given that a significant percentage of PPL's regulated earnings were foreign earnings from the United Kingdom that were difficult to repatriate tax-free to the U.S., and that its regulated utilities in Pennsylvania, the United Kingdom, and Kentucky had a large cash-driven capex plan—in reality the dividend was heavily supported by PPL's

unregulated business' cash flows. Further, upon conversion of PPL's then convertible notes (from debt to equity) that were used, in part, to fund PPL's growth plan, PPL's cash dividend funding needs increased significantly.

36.    As a result, PPL had to do something to shore up its balance sheet. Obvious options would have been to cut PPL's dividend or issue more PPL stock. But these options would have imposed a cost on PPL's shareholders, which included its officers and directors.   To avoid dividend pressure during an aggressive growth phase, and avoid a significant stock decline (as the common stock dividend yield supported PPL's stock price), PPL's officers and directors decided, among other things, to strip the value out of PPL Montana and leave it as an empty shell to face its mounting environmental and other liabilities.

### D.    PPL's scheme to strip the value out of PPL Montana and leave it an empty shell to face its mounting liabilities

37.    PPL had initially attempted to sell all of PPL Montana's assets, soliciting bids in September 2012.  But it quickly became apparent that, while PPL Montana's hydroelectric assets had significant value, its coal-fired assets had none. In fact, NorthWestern submitted a $740 million bid for only PPL Montana's hydroelectric assets, as well as a bid of $400 million for *both* the hydroelectric assets *and* the coal-fired assets—suggesting a substantial negative valuation of the coal-fired assets.  Realizing that it would not get an economic return for its sale of all of PPL Montana's assets, PPL decided to take the hydroelectric assets' value

for itself and leave the negative value of the coal-fired assets behind to the detriment of PPL Montana.

38.     To implement its scheme, PPL took advantage of the domination and control that it exercised over PPL Montana.  PPL indirectly owned all of PPL Montana through intermediate subsidiaries that PPL also controlled.  At the time of the Distribution, PPL (or its affiliates) employed all three managers on PPL Montana's Board of Managers (Defendants Farr, Wilten, and Simonich) and nearly all of its officers.[3]  Two of these PPL-employed managers, Defendants Farr and Wilten, also served as PPL's Chief Financial Officer and Treasurer, respectively, and in those roles, were primarily responsible for managing PPL's increasing debt load.  At the time of the Distribution, Defendant Simonich had worked in the power generation business for nearly 34 years; first at the Montana Power Company and then PPL Montana.  As of November 2014, Simonich had been the highest-ranking officer of PPL Montana for more than five years, in addition to serving in a number of executive roles, including as the executive with overall management of the Colstrip facility and the manager with primary responsibility for PPL Montana's hydroelectric assets.  In these roles, Simonich was directly involved in PPL Montana's major management decisions and knew of its business

---

[3] PPL also employed the members of the boards of managers of various intermediate subsidiaries with control over PPL Montana.

plans and strategies, as well as its major financial obligations and liabilities. Similarly, Farr was also heavily involved in PPL's mergers and acquisitions activity and would have formulated PPL's plans for selling the PPL Montana assets, taking into account his in-depth knowledge of PPL Montana's assets and liabilities.

39.    As their first step in the scheme, in September 2013, PPL caused PPL Montana to enter into an agreement to sell PPL Montana's hydroelectric assets to NorthWestern for approximately $900 million.  Defendant Simonich's and his co-PPL Montana managers' approvals were necessary for the disposition of PPL Montana's most valuable assets, pursuant to both Section 5.2 of PPL Montana's limited liability company agreement and Delaware's Limited Liability Company Act, Del. Code Ann. tit. 6, § 18-402.   On November 17, 2014, the sale to NorthWestern closed, and PPL Montana collected a cash payment of over $900 million.

40.    On November 17, 2014, the same day that the sale to NorthWestern closed, PPL caused PPL Montana to make the Distribution, in which the proceeds from the hydroelectric sale were distributed up to PPL and its affiliates in the following sequence:

    a)    The PPL-controlled Board of Managers of PPL Montana (Defendants Farr, Wilten, and Simonich) authorized a distribution of the hydroelectric sale proceeds to PPL Montana Holdings, LLC.

b) The PPL-controlled Board of Managers of PPL Montana Holdings, LLC (Defendants Farr, Wilten, and Simonich) then authorized a distribution of the hydroelectric sale proceeds to PPL Generation, LLC.

c) The PPL-controlled Board of Managers of PPL Generation, LLC then authorized a distribution of the hydroelectric sale proceeds to PPL Energy Supply, LLC.

d) The PPL-controlled Board of Managers of PPL Energy Supply, LLC then authorized a distribution of the hydroelectric proceeds to Defendant PPL Energy Funding Corporation.

e) On information and belief, Defendant PPL Energy Funding Corporation distributed the proceeds to PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corporation, or other PPL affiliates shortly thereafter.

Defendant Simonich in conjunction with co-PPL Montana Managers Wilten and Farr played a key role in the Distribution.  Consent of Simonich and the other PPL Montana Managers was required for the Distribution, pursuant to Section 5.2 of PPL Montana's limited liability company agreement and Delaware's Limited Liability Company Act, Del. Code Ann. tit. 6, § 18-402.  But for that consent, the funds from the sale of hydroelectric assets would have remained with Talen Montana.  Simonich knew of PPL Montana's extensive liabilities, and knew the Distribution would leave PPL Montana without assets to satisfy its liabilities (*i.e.*, insolvent), as did co-PPL Montana managers Farr and Wilten.  Of the PPL Montana Managers whose authorization was required for the sale of hydroelectric assets and coincident Distribution, Simonich had the greatest personal first-hand knowledge and experience with PPL Montana.  During the period 1999-2014,

Simonich served in a number of executive roles at PPL Montana, including (among other things) the overall management of the Colstrip facility.  Indeed, of the three PPL Montana Managers in office as of November 2014, Simonich personally knew the most about PPL Montana's business strategies, operations, assets, and liabilities, including, *inter alia*, the company's business plans, financial projections, and AOC obligations.  Nevertheless, despite his unique knowledge, Simonich (along with his co-PPL Montana Managers, Farr and Wilten) took none of the steps required of a fiduciary, including, without limitation, assessing assets and liabilities and obtaining a solvency opinion.  Simonich had long experience with PPL Montana and was in the best position to assess the exposure of PPL Montana and its creditors and take action as necessary to protect those interests but failed to do so, instead signing off on the Distribution which, but for his consent, could not have occurred.

41.    On information and belief, the Distribution was for no or inadequate value to PPL Montana.  Remarkably, neither PPL nor the PPL-controlled managers (including Defendants Farr, Simonich, and Wilten) who approved the Distribution at every step implemented any process to determine whether PPL Montana would be solvent after the Distribution or otherwise protect the interests of PPL Montana and its creditors.  On information and belief, Defendants did not obtain a solvency opinion on behalf of Talen Montana before causing the Distribution.  Nor did they

retain an external advisor.  Of course, particularly given intimate knowledge of PPL Montana's financial condition on the part of Farr and Simonich, they and the other Defendants knew that any such process would not result in the outcome they desired.  Intent on taking the money out of PPL Montana, they simply did not care what impact the Distribution would have on PPL Montana and its creditors.

42.    Months later, PPL completed the Spin-Off of PPL Montana, PPL Montana Holdings, LLC, PPL Generation, LLC, and PPL Energy Supply, LLC. But the Distribution remained with Defendant PPL and its wholly owned subsidiaries, including Defendants PPL Capital Funding, Inc., PPL Electric Utilities Corporation, and PPL Energy Funding Corporation.

### E.    The Distribution rendered PPL Montana insolvent

43.    The Distribution rendered PPL Montana insolvent (disregarding the value of the claims asserted herein).   After the Distribution, PPL Montana's ownership interests in Colstrip and Corette were its only material, tangible assets. PPL and PPL Montana's PPL-controlled managers knew, at the time of the Distribution, that both facilities were deeply troubled and burdened by mounting obligations.  Colstrip had been assigned a fair market valuation of approximately $5 million (in connection with the December 2013 termination of a sale-leaseback arrangement for the Colstrip plant), and Corette would be "mothballed" within a few months' time.

44.     PPL and PPL Montana's PPL-controlled managers also knew, at the time of the Distribution, that PPL Montana's liabilities substantially outstripped the value of these assets, and that PPL Montana would receive no reasonably equivalent value for the Distribution.  Under the 2012 AOC with the MDEQ, PPL Montana had substantial closure and remediation obligations associated with Colstrip's ash ponds.  At the time of the Distribution, the Asset Retirement Obligation ("ARO") associated with the AOC was grossly understated on PPL Montana's books at approximately $1 million.  Confirming insolvency, PPL Montana's late-2014 business plan projected negative free cash flow over the next five years after accounting for expected environmental remediation costs.

45.     The liabilities disclosed on PPL Montana's balance sheet were concerning enough; the undisclosed reality was far worse.  Projections prepared by Geosyntec, PPL Montana's environmental contractor, estimated that it would cost Colstrip $198 million to comply with the EPA's new CCR rules.  In addition, there was a reasonable expectation that PPL Montana would face significant additional AOC costs.  At the time of the Distribution, PPL and PPL Montana's PPL-controlled managers knew of these estimates and assessments but concealed them from PPL Montana.  Consistent with these assessments, the actual projected costs to comply with the 2012 AOC are approximately *$500 million* in the aggregate. Defendant Simonich, in particular, through his direct participation in PPL Montana

management over a period of more than a decade, had knowledge of the extent of PPL Montana's liabilities.

46.    No reasonable cash flow projections showed PPL Montana with adequate future income or assets to pay its liabilities.  Under all three solvency tests—balance sheet insolvency, inability to pay debts when due, and unreasonably small capital—the Distribution rendered PPL Montana insolvent.  And its PPL-controlled managers knew, or recklessly ignored, that the Distribution would have precisely this effect.

47.    As further evidence of insolvency, PPL knew that an arm's-length purchaser, NorthWestern, had assigned a significant negative value for the coal-fired assets during the recently completed sales process for PPL Montana's hydroelectric assets.

### F.    Until December 2016, PPL Montana was dominated by participants in the improper scheme

48.    Mere months after the Distribution, PPL contributed PPL Montana to Talen as part of the Spin-Off on June 1, 2015, at which time PPL Montana was renamed Talen Montana.  While the claims asserted in this Complaint are based on Defendants' conduct prior to the Spin-Off, it is significant that individuals who had perpetrated PPL's scheme before the Spin-Off continued to dominate and control PPL Montana after it became Talen Montana:  Defendant Farr became Talen's new Chairman, President, and CEO; four members of PPL's board of directors who had

approved the Distribution sat with him on Talen's board; and together, these five individuals comprised a majority of Talen's eight-member board.  Many of PPL Montana's pre-spin, PPL-controlled officers became its new managers.  This situation would persist for another eighteen months, until December 6, 2016.

49.    In addition, the fact and extent of PPL Montana's (now Talen Montana's) insolvency as a result of the Distribution was fraudulently concealed from PPL Montana and its creditors until December 6, 2016, when the entity was no longer dominated by participants in the improper scheme.  An entity like PPL Montana can only gain knowledge imputed through its agents.  As a matter of law, agents' knowledge is not imputed where they are working adversely to the interests of the company.  Such was the case at PPL Montana.  In approving the Distribution despite knowing that it would render PPL Montana insolvent, PPL Montana's PPL-controlled managers were working adversely to the interests of PPL Montana and its creditors (whose interests PPL Montana's fiduciaries were required to consider in any decision that would render PPL Montana insolvent).

50.    This transaction, which left PPL Montana insolvent, was an actual and constructive fraudulent transfer.  Defendants knew, as of June 2010 when the first draft of the CCR rules were published, that PPL Montana would face substantial environmental liabilities.  At the time of the Distribution, and likely long before, Defendants knew or had reason to know that the Distribution would render PPL

Montana insolvent and unable to meet its obligations.  Defendants removed more than $900 million in assets from PPL Montana in order to enrich PPL and hinder, delay, or defraud PPL Montana's current and contingent creditors.

51.   Due to PPL Montana's (later Talen Montana's) domination and control by the participants in the improper scheme and the fraudulent concealment by Defendants, Talen Montana could not reasonably have taken action regarding the Distribution or learned the truth until December 6, 2016, at the earliest.

## V.   CLASS ACTION ALLEGATIONS

52.   Lead Plaintiffs bring this Complaint as a class action lawsuit in their individual and representative capacities.   The Class consists of current and contingent creditors of Talen Montana who:

(a)   have been defrauded under statutory fraudulent transfer law and common law due to the Distribution; and

(b)   have suffered harm, or will suffer reasonably foreseeable harm, as a result of Defendants' concert of action, civil conspiracy, and unjust enrichment from the Distribution, and therefore seek a constructive trust to remedy the unjust enrichment (the "Class").

53.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Montana Rules of Civil Procedure on behalf of a creditor

class consisting of all persons and entities that are current and contingent creditors of Talen Montana.

54.     Because there are hundreds of class members entitled to relief as a result of the wrongful Distribution, more than two-thirds of which are citizens of Montana, members of the Class are so numerous that joinder of all members is impracticable and they are geographically dispersed.

55.     Lead Plaintiffs' claims are typical of the claims of the members because all members sustained damages arising out of Defendants' conduct.

56.     Lead Plaintiffs will fairly and adequately protect the interests of the creditor class members and have retained counsel experienced and competent in class actions and fraudulent transfer litigation.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, there would be a multiplicity of suits required to redress individually the wrongs done to the current and contingent creditors.  There will be no difficulty in the management of this action as a class action.

58.     Lead Plaintiffs share common questions of fact and law with the other Class members.   Such questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members of

the Class, in that Defendants have acted on grounds generally applicable to the entire Class.

59.   The class action claims are brought for and on behalf of predominantly Montana-based creditors of a Montana-based entity.  The claims are subject to and governed by Montana law.   The injuries complained of were incurred in Montana, by primarily Montana creditors, including Lead Plaintiff Talen Montana Retirement Plan, nearly all of whose hundreds of beneficiaries are residents of Montana.   The most significant creditor of Talen Montana is the Montana Department of Environmental Quality, whose claims primarily concern remediation at the Colstrip, Montana power plant.  In all, more than two-thirds of the putative class are citizens of the state of Montana.  The controversy is local, focused on Montana, and, as such, is not of national importance, but instead is one that uniquely effects Montana.  The conduct of Defendant Simonich, a Montana resident, forms a highly significant basis for all the claims asserted by the class, in that, but for Simonich's conduct, the Distribution would not or could not have occurred in the manner it did, and Simonich, given his long experience with PPL Montana, was in unique position to act, and indeed the only individual with his unique background and experience to act, but failed to do so.  The class seeks relief, including actual and punitive damages, from all Defendants, including Defendant Simonich, against whom all claims except for fraudulent transfer are

asserted.  The class asserts actual and constructive fraudulent transfer claims against the Distribution's transferees, and a number of causes against Simonich and the other individual Defendants based on their responsibility for the fraudulent transfer.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### ACTUAL FRAUDULENT TRANSFER
### (against PPL Energy Funding Corp.)

60.   Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

61.   On November 17, 2014, Defendants caused the Distribution, in which the proceeds from the sale of PPL Montana's hydroelectric assets were transferred from PPL Montana through a series of conduits to PPL Energy Funding Corp.

62.   The Distribution was made with the intent to hinder, delay, or defraud creditors.  This intent is evidenced by at least the facts that:

- the Distribution was provided to PPL Energy Funding Corp., which at the time was an affiliate of PPL Montana;

- the Distribution rendered PPL Montana insolvent;

- the Distribution was not for reasonably equivalent value;

- Defendants concealed from PPL Montana's creditors the fact of its insolvency;

- Defendants concealed from PPL Montana's creditors that they did not intend to leave any support or allowance for PPL Montana's liabilities in exchange for the Distribution; and

63.     PPL Montana's creditors were harmed by the Distribution.

64.     The Distribution, or the value of the Distribution, is avoidable as a statutory fraudulent transfer and should be recovered from PPL Energy Funding Corp.

**COUNT II**
**CONSTRUCTIVE FRAUDULENT TRANSFER**
**(against PPL Energy Funding Corp.)**

65.     Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

66.     On November 17, 2014, Defendants caused the Distribution, in which the proceeds from the sale of PPL Montana's hydroelectric assets were transferred from PPL Montana through a series of conduits to PPL Energy Funding Corp.

67.     The Distribution rendered PPL Montana insolvent because after the Distribution, PPL Montana's total liabilities were greater than all of PPL Montana's assets at a fair valuation.  By making the Distribution, Defendants caused PPL Montana to engage in a business or transaction for which PPL's remaining assets were unreasonably small in relation to the Distribution.

68.     PPL Montana received less than reasonably equivalent value in exchange for the Distribution.

69.     PPL Montana had creditors at the time of the Distribution.

70.    The Distribution, or the value of the Distribution, is avoidable as a statutory fraudulent transfer and should be recovered from PPL Energy Funding Corp.

**COUNT III**
**RECOVERY AGAINST SUBSEQUENT TRANSFEREES**
(**against PPL Corporation, PPL Capital Funding, Inc.,**
**PPL Electric Utilities Corp., and DOES 1-50**

71.    Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

72.    On November 21, 2014, Defendants caused the Distribution.    As alleged above, the Distribution is voidable under statutory fraudulent transfer law as an actual or constructive fraudulent transfer.

73.    Shortly thereafter, on information and belief, PPL Energy Funding Corp. transferred the Distribution to PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., and/or DOES 1-50.

74.    PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., and/or DOES 1-50 received the Distribution with knowledge that the Distribution rendered PPL Montana insolvent, and thus did not take the Distribution in good faith.    On information and belief, PPL, PPL Capital Funding, Inc., and/or PPL Electric Utilities Corp. also received the Distribution for no or inadequate value to PPL Montana.

75.     The Distribution, or the value of the Distribution, is avoidable as a statutory fraudulent transfer and should be recovered from PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., and/or DOES 1-50.

**COUNT IV**
**CIVIL CONSPIRACY**
**(against all Defendants)**

76.     Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

77.     Defendants had a meeting of the minds on an object to be accomplished, as alleged herein.  Specifically, and without limitation, Defendants together conspired to commit an actual and constructive fraudulent transfer as set forth above by agreeing to act in concert to cause the Distribution, rendering PPL Montana insolvent.

78.     The object of the Defendants' conspiracy was to hinder, delay, or defraud PPL Montana's creditors.

79.     To accomplish the above unlawful objective, Defendants authorized and directed the Distribution to PPL Energy Funding Corp. and thereafter, on information and belief, to PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., and/or DOES 1-50.

80.     As a proximate result of Defendants' conspiracy, PPL Montana's creditors suffered damages in an amount to be proven at trial.

## COUNT V
## AIDING AND ABETTING TORTIOUS CONDUCT
### (against all Defendants)

81.　Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

82.　Defendants knowingly engaged in tortious concert with a common design—specifically they planned and executed the Distribution, which was an actual or constructive fraudulent transfer.

83.　Defendants gave substantial assistance and encouragement by participating in, agreeing to, and authorizing the Distribution.

84.　As a result of the substantial assistance and encouragement from Defendants, the Class has suffered significant harm and Defendants should be held liable for PPL's tortious conduct.

## COUNT VI
## UNJUST ENRICHMENT
### (against Defendants PPL Corporation, PPL Capital Funding, Inc.,
### PPL Electric Utilities Corp., PPL Energy Funding Corp., and DOES 1-50)

85.　Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

86.　PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., and DOES 1-50 were unjustly enriched by the Distribution, which left PPL Montana insolvent, to the detriment of PPL Montana's current and contingent creditors.

87.    PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., and DOES 1-50's continued retention of the Distribution is unjust.

88.    Under the circumstances, it would be inequitable for PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., and DOES 1-50 to retain the Distribution.

89.    To prevent unjust enrichment, the Class is entitled to imposition of a constructive trust together with such other and further relief as the Court deems just and equitable.

**COUNT VII**
**CONSTRUCTIVE TRUST**
**(against Defendants PPL Corporation, PPL Capital Funding, Inc.,**
**PPL Electric Utilities Corp., PPL Energy Funding Corp., and DOES 1-50)**

90.    Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

91.    On November 17, 2014, Defendants intentionally caused the Distribution to PPL Energy Funding Corp. and, on information and belief, subsequently to PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., and/or DOES 1-50.  The Distribution rendered PPL Montana insolvent.

92.    PPL, PPL Capital Funding, Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., and DOES 1-50 have been unjustly enriched in that they currently possess hundreds of millions of dollars that rightfully belong to PPL

Montana to satisfy its creditors, including in relation to PPL Montana's environmental liabilities and its pension plan. The money from the improper Distribution belongs in the state of Montana to pay remediation cost and pension plans of Montana state residents.

93. To prevent unjust enrichment, the Class is entitled to imposition of a constructive trust together with such other and further relief as the Court deems just and equitable.

## COUNT VIII
## PUNITIVE DAMAGES
### (against all Defendants)

94. Lead Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth here.

95. Defendants acted with fraud or actual malice in that Defendants had knowledge of facts or intentionally disregarded facts that created a high probability of injury to PPL Montana's creditors and deliberately proceeded to act in conscious or intentional disregard of, or with indifference to, the high probability of injury to those creditors.

96. Defendants herein are guilty of actual fraud in that they authorized the Distribution in order to hinder, delay, or defraud PPL Montana's creditors.

97. The Class is entitled to an award of punitive damages against Defendants, in an amount to be proven at trial.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for the following relief:

A.    An Order certifying this action as a class action, and awarding recovery to the Class in amounts to be proved at trial;

B.    Relief for actual fraudulent transfer, including but not limited to avoidance of the Distribution or the value of the Distribution at law or in equity;

C.    Relief for constructive fraudulent transfer, including but not limited to avoidance of the Distribution or the value of the Distribution at law or in equity;

D.    Damages for civil conspiracy in an amount to be proved at trial;

E.    Damages for concert of action in an amount to be proved at trial;

F.    Restitution and other such equitable remedies as may be just to prevent the unjust enrichment of Defendants;

G.    Imposition of a constructive trust;

H.    Punitive damages in an amount to be proved at trial;

I.    Recovery of such costs and fees as may be awardable at law or in equity; and

J.    Such other relief as may be awardable at law or in equity.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:        January 23, 2019

By:   /s/ Robert L. Sterup
Robert L. Sterup
BROWN LAW FIRM, PC

*ATTORNEYS FOR PLAINTIFFS*
*TALEN MONTANA RETIREMENT PLAN*
*AND*
*TALEN ENERGY MARKETING, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of January, 2019, a copy of the foregoing was electronically filed and served on the following persons by the following means:

| | | | |
|---|---|---|---|
| <u>1-5</u> | CM/ECF | _____ | Fax |
| _____ | Hand Delivery | _____ | E-Mail |
| _____ | Mail | _____ | Overnight Delivery |

1.      U.S District Court, Billings Division\

2.      T. Thomas Singer
         Axilon Law Group, PLLC
         115 North Broadway, Ste. 310
         P.O. Box 987 Billings, MT 59103-0987
         tsinger@axilonlaw.com

         AND

3.      Elizabeth L. Griffing
         Axilon Law Group, PLLC
         Power Block, Ste. 4P
         7 West 6th Ave.
         Helena, MT 59601
         bgriffing@axilonlaw.com
         *Attorneys for Defendants*
         *PPL Corporation; PPL Capital Funding, Inc.; PPL Electric Utilities Corp.; PPL Energy Funding Corp.; Mark F. Wilten; Peter J. Simonich;*

4.      Mark D. Parker
         Casey Heitz
         Parker, Heitz & Cosgrove, PLLC
         401 N. 31st St, Ste 805
         P.O. Box 7212
         Billings, MT 59103-7212
         markdparker@parker-law.com
         caseyheitz@parker-law.com
         *Attorneys for Defendant Paul A. Farr*

5.     Joshua L. Seifert, PLLC
        175 Varick Street
        New York, New York 10014
        jseifert@seifertpllc.com

*Attorneys for Defendant Paul A. Farr*

By:   /s/ Robert L. Sterup
        Robert L. Sterup
        *Attorneys for Plaintiffs*