

SEP 1 6 2019

Clerk, U S District Court
District Of Montana
Billings

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| Talen Montana Retirement Plan and Talen Energy Marketing, LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PPL Corporation, PPL Capital Funding Inc., PPL Electric Utilities Corp., PPL Energy Funding Corp., Paul A. Farr, Mark F. Wilten, Peter J. Simonich, and DOES 1-50,<br><br>Defendants. | Cause No. CV-18-174-BLG-SPW<br><br>**OPINION AND ORDER** |

Before the Court is a motion to remand the case to state court filed by Plaintiffs Talen Montana Retirement Plan and Talen Energy Marketing, LLC, individually and on behalf of others similarly situated. (Doc. 18). For the following reasons, the motion is granted.

## I.     Background According to the First Amended Complaint

In 1999, PPL Corporation (PPL) purchased 11 hydroelectric facilities, a storage dam, and ownership interests in coal-fired plants in Colstrip, Montana, and Corette, Montana, from Montana Power Company for $769 million. (Doc. 17, ¶¶

23-24). PPL created PPL Montana, a subsidiary, to acquire and manage the energy assets. (Doc. 17, ¶ 1).

For the next thirteen years, PPL Montana generated more than $325 million in profits for PPL. (Doc. 17, ¶ 25). In 2012, due to a number of converging factors, energy prices dropped in Montana, causing PPL's profits to fall. (Doc. 17, ¶ 28). Although its hydroelectric assets were projected to continue to generate profits, its coal-fired plants in Colstrip and Corette were projected to have negative returns due to long-term contracts with coal suppliers in the midst of energy prices dropping. (Doc. 17, ¶ 28). In addition to the drop in energy prices, the coal plants were subject to new regulation from federal and state governments, and increased pressure from environmental activism. (Doc. 17, ¶¶ 29-33). The United States Environmental Protection Agency was formulating new regulations related to disposal of coal ash, which would result in higher production costs. (Doc. 17, ¶ 29). The Montana Department of Environmental Quality imposed extensive closure, remediation, and financial obligations on PPL Montana due to seepage from the coal plants' ash ponds. (Doc. 17, ¶ 31). The Sierra Club sued PPL Montana under the Clean Air Act for civil penalties and injunctive relief concerning the Colstrip coal plant. (Doc. 17, ¶ 32).

While issues with the coal plants were going on, PPL acquired utilities in Kentucky and the United Kingdom for a combined cost of $13.2 billion. (Doc. 17,

¶ 34). PPL also designed plans to modernize existing utility operations for more than $15 billion. (Doc. 17, ¶ 34). The combined effect of PPL's declining energy profits and utility acquisitions was financial stress. (Doc. 17, ¶ 35). To ease the financial stress, PPL began shopping PPL Montana's assets. (Doc. 17, ¶ 37). Northwestern Energy submitted two bids. One bid was $740 million for PPL Montana's hydroelectric assets, the other bid was $400 million for PPL Montana's hydroelectric and coal-fired assets. (Doc. 17, ¶ 37). The coal-fired assets carried such a substantial negative valuation that PPL decided to sell PPL Montana's hydroelectric assets, distribute the proceeds to PPL, and leave the coal fired assets with PPL Montana. (Doc. 17, ¶ 37).

At the time of the sale, all three of PPL Montana's board of managers were employed by PPL. (Doc. 17, ¶ 38). One of these managers was Peter Simonich. Simonich had worked in the energy business for nearly 34 years, including serving as the highest ranking officer for PPL Montana and the executive of the Colstrip coal-fired plant. (Doc. 17, ¶ 38). Simonich and PPL Montana's other two managers approved PPL Montana's sale of its hydroelectric assets to Northwestern for approximately $900 million. (Doc. 17, ¶ 39). Simonich's approval was necessary for the sale. (Doc. 17, ¶ 39).

As soon as the sale was complete, Simonich and his fellow managers on the board authorized the distribution of the $900 million from PPL Montana to PPL

despite knowing the distribution would leave PPL Montana insolvent. (Doc. 17, ¶¶ 39-40). Simonich's approval of the distribution to PPL was necessary for the distribution to occur. (Doc. 17, ¶ 40).

The distribution left PPL Montana insolvent—just as Simonich, his fellow managers, and PPL knew it would—with only the coal-fired plants its material assets. The Colstrip plant had a fair market value of just $5 million, and the Corette plant was set to close because it was no longer economically viable. (Doc. 17, ¶¶ 33, 43). PPL Montana's liabilities vastly outweighed its assets. PPL Montana's cost to comply with the EPA's new coal ash disposal rule was estimated at $198 million. (Doc. 17, ¶ 45). The Montana Department of Environmental Quality charged PPL Montana with an estimated $500 million remediation cost to clean up the Colstrip plant's coal ash ponds. (Doc. 17, ¶ 45). Hundreds of current employees and retirees held a defined benefit pension plan which became underfunded. (Doc. 17, ¶¶ 5, 10). The vast majority of the current employees and retirees are Montana citizens, and almost three hundred of them are residents of a single county in Montana. (Doc. 40 at 64-71).

Less than a year after rendering PPL Montana insolvent, PPL completed a spin-off transaction, wherein PPL Montana became a subsidiary of a new company completely unaffiliated with PPL, called Talen Energy Corporation, which subsequently changed its name to Talen Montana. (Doc. 17, ¶ 7).

Talen Montana's pension plan and Talen Energy Marketing LLC, an affiliate of Talen Montana, filed suit against PPL in Montana state district court, alleging actual fraudulent transfer, constructive fraudulent transfer, recovery against subsequent transferees, civil conspiracy, concert of action, unjust enrichment, constructive trust, and punitive damages. (Doc. 17, ¶ 9). The Plaintiffs brought the suit as a class action on behalf of all current and contingent creditors of Talen Montana. (Doc. 17, ¶ 52). The first amended complaint seeks a constructive trust, damages equal to the distribution, and punitive damages. (Doc. 17 at 35). PPL removed the action to this Court under the Class Action Fairness Act, 28 U.S.C. §§ 1332, 1453. (Doc. 1). The Plaintiffs filed a motion to remand the case back to state court under the local controversy exception to CAFA. (Doc. 18).

## II. CAFA

CAFA was enacted to curb perceived abuses in class action litigation, wherein plaintiffs' lawyers would name a non-diverse defendant to defeat diversity jurisdiction and thereby litigate otherwise national interest class actions locally in state court. S. Rep. 109-14 at 4-5. To end the practice, CAFA amended the requirements for diversity jurisdiction in class actions by granting district courts original jurisdiction over class actions exceeding $5,000,000 in controversy where at least one plaintiff is diverse from at least one defendant. *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1033-1034 (9th Cir. 2008). In essence,

5

for class actions, Congress replaced federal court's usual jurisdictional requirement of complete diversity with minimal diversity. *Mondragon v. Capital One Auto Finance*, 736 F.3d 880, 882 (9th Cir. 2013). Congress recognized, however, that in certain instances, minimal diversity would cause the opposite of CAFA's intended effect; truly local class actions that have little to no national interest would be forced into federal court when state court would be the more appropriate forum. S. Rep. 109-14 at 38. To address the concern, Congress inserted several exceptions into CAFA which require or permit a federal court to remand a case back to state court. One of the exceptions is the aptly named Local Controversy Exception. The Local Controversy Exceptions removes federal diversity jurisdiction:

> (A)(i) over a class action in which--
> (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
> (II) at least one defendant is a defendant—
> (aa) from whom significant relief is sought by members of the plaintiff class;
> (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
> (cc) who is a citizen of the State in which the action was originally filed; and
> (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
> (ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.

28 U.S.C. § 1332(d)(4)(A)(i-ii). The burden of proof to establish the Local Controversy Exception rests on the party seeking remand. *Mondragon*, 736 F.3d at 883.

### III. Discussion

The Plaintiffs argue the Local Controversy Exception applies here. The Defendants respond the Local Controversy Exception does not apply because Montana citizens do not make up two-thirds of the class, no defendant is a Montana citizen from whom significant relief is sought and whose conduct forms a significant basis for the claims asserted, and principal injuries were not incurred in Montana but instead nationwide.

#### A. The two-thirds requirement

Whether two-thirds of the member class are citizens of Montana is an issue of fact that must be resolved by the Court. *Mondragon*, 736 F.3d at 883. A district court makes factual findings regarding jurisdiction under a preponderance of the evidence standard. *Mondragon*, 736 F.3d at 884. Just as in other contexts, district courts are permitted to make reasonable inferences from facts in evidence. *Mondragon*, 736 F.3d at 886. The evidentiary burden placed on the party seeking remand is not "exceptionally difficult to bear." *Mondragon*, 736 F.3d at 886.

Defendants make two arguments regarding the greater than two-thirds requirement. First, they argue the class cannot include current and former

employees enrolled in Talen Montana's pension plan because the pension plan is an ERISA governed plan and ERISA preempts any claims the current and former employees may have against Talen Montana and therefore the current and former employees cannot be creditors of Talen Montana. Second, Defendants argue even if the current and former employees are included in the class, greater than two-thirds of the proposed class are still not Montana citizens.

Regarding the Defendants' first argument, they misunderstand the Court's inquiry at this early stage. The Court's task at this point is to determine whether it has subject matter jurisdiction over the proposed class action under 28 U.S.C. § 1332(d). *Allen v. Boeing Co.*, 821 F.3d 1111, 1119 n.8 (9th Cir. 2016). Part of that determination is figuring out whether greater than two-thirds of the proposed class members are citizens of Montana. 28 U.S.C. § 1332(d)(4)(A)(i)(I). "Class members" means persons, named or unnamed, who fall within the definition of the proposed class. 28 U.S.C. §1332(d)(1)(D). The proposed class here is defined as current and contingent creditors of Talen Montana, meaning any person who has a claim against or right to payment from Talen Montana, regardless of the basis for the claim. (Doc. 17, ¶ 52); Mont. Code Ann. § 31-1-328(3-4). ERISA provides a claim for employees against an employer, including equitable relief in the form of a money payment. 29 U.S.C. § 1132(a)(1), (2); *CIGNA Corp. v. Amara*, 563 U.S. 421, 441-442 (2011). Thus, even if the only claims available to the current and

8

former employees against Talen Montana were ERISA claims, they would still be current or contingent creditors of Talen Montana and therefore members of the proposed class. Whether ERISA complicates or precludes certification of the class is a question for later down the road. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Service Workers Intern. Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1090-1092 (class certification is a separate inquiry determined after subject matter jurisdiction). CAFA clearly states the Court's subject matter jurisdiction hinges on the class as proposed, 28 U.S.C. § 1332(d)(4)(A)(i)(A), and, as proposed, the class includes current and former employees with claims against Talen Montana, whether based on ERISA or otherwise, because they are current or contingent creditors of Talen Montana.

Regarding the Defendants' second argument, the Court finds it is a fact that greater than two-thirds of the proposed class are Montana citizens. The proposed class consists of 1,240 creditors, 845 of which are Montana citizens. The Court finds the following facts:

 1. There are 1,240 current or contingent creditors of Talen Montana. (Doc. 44 at 11-12).

 2. There are 99 business creditors who are Montana citizens. The Court bases this finding on the affidavits of Tyler Schwartz, Henry Gonzales, and Stephen Heskett. Schwartz is a financial analyst at Talen

9

Energy Supply LLC who maintains records of unpaid invoices. (Doc. 19-4). Gonzales is a paralegal who, using Schwartz's list, researched the entities on the invoices to determine their state of incorporation and principal place of business using the Montana Secretary of State's website, Westlaw, and Google. (Doc. 19-6). Heskett is a private investigator hired by the Defendants who vetted Gonzales and Schwartz's findings. (Doc. 40). The combined findings of the three establish there are 101 business creditors who are Montana citizens, two of which are law firms related to the case who may not be counted. (Doc. 40 at 53-55 minus Taylor Luther Group, PLLC and Brown Law Firm).

    3.    There are 617 Talen Montana Retirement Plan beneficiaries who are Montana citizens. The Court bases this finding on the affidavits of Derek James, Troy Hantla, and Heskett. James is the administrator for Talen Montana's retirement plan. (Doc. 19-3). James maintains records of every plan beneficiary, including name, date of birth, primary phone number, and residential and mailing address. (Doc. 19-3 at ¶ 3). The records are updated quarterly, including changes to contact information and residential and mailing address. (Doc. 19-3 at ¶ 4). Hantla is the compensation manager at Talen Energy Supply LLC. (Doc. 19-5). Hantla maintains records for all employees, including addresses. (Doc. 19-5 at ¶¶ 2-4). As with the business

creditors, Heskett vetted James and Hantla's findings. (Doc. 40). The combined findings of the three establish there were 632 plan beneficiaries who were potentially Montana citizens. (Doc. 40 at 63-72). Further investigation confirmed 616 of the 632 were Montana citizens. Yet even further investigation revealed the original 632 count omitted an additional Montana citizen. The 616 beneficiaries are those identified as Montana citizens in Doc. 40 at 63-72, minus Noreen Restard, Richard R. Kroll, Susan E. Wolfe, Terry Bad Warrior, Matthew Blankenship, Bradley Fahrenbruck, Carl Farnsworth, Chad Formanek, Eric Kilroy, Dustin James Krob, David E. Krueger, Charleen Z. Luttrell, Jacqueline Newell, Ayla Parker, Morris Wicker, and Gregory D. Wilson. The additional Montana citizen is Gary Joel Eernisse. (Doc. 44-2 at ¶¶ 5-6). The total plan beneficiaries that are Montana citizens is therefore 617.[1]

4.      There are 129 Talen Montana employees who are creditors and Montana citizens but not Talen Montana Retirement Plan beneficiaries. (Doc. 19-6 at ¶ 5). The Court bases this finding on the affidavit of Gonzales. (Doc. 19-6). Gonzales compared the findings of Hantla and James by removing from Hantla's list any employee creditors who were listed as plan

---

[1] Defendants argue this number includes four people now deceased. The Defendants do not explain why the estates may not maintain the action on the deceased persons' behalf.

11

beneficiaries in James' list. (Doc. 19-6 at ¶ 5). The comparison left 129 employees who are creditors and Montana citizens. (Doc. 19-6 at ¶ 5).

5.   845 of the 1240 proposed class members are Montana citizens, which is 68.1%.

Because greater than two-thirds of the proposed class are Montana citizens, the Court finds the Plaintiffs have satisfied their burden under 28 U.S.C. § 1332(d)(4)(A)(i)(I).

**B.   The significant relief and significant basis requirements**

Unlike the greater than two-thirds requirement, whether there is a local defendant "from whom significant relief is sought" and "whose alleged conduct forms a significant basis for the claims" is not a factual determination. Instead, the statutory language directs the Court to look only at the complaint to determine whether the criteria are met. *Coleman v. Estes Exp. Lines, Inc.*, 631 F.3d 1010, 1012-1015 (9th Cir. 2011). By limiting the Court's inquiry to the complaint, Congress "inherently cabin[ed] the amount of detail required to satisfy the local controversy exception." *Allen*, 821 F.3d at 1117.

The Plaintiffs claim Defendant Peter Simonich is a Montana citizen from whom significant relief is sought and whose conduct forms a significant basis for the claims.

**1.   Significant relief**

The Defendants argue the Plaintiffs do not seek significant relief from Simonich in any practical sense, presumably because Simonich cannot satisfy a $900 million judgment himself. The Ninth Circuit has already rejected that argument, explaining "[a] defendant from whom significant relief is sought does not mean a defendant from whom significant relief may be obtained." *Coleman*, 631 F.3d at 1015. Instead, to determine if significant relief is sought from a defendant, the Court looks to the remedies requested. *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1119 (9th Cir. 2015) (citing *Coleman*, 631 F.3d at 1020). In *Benko*, the Ninth Circuit held a request for $10,000 general damages plus punitive damages and equitable relief was a request for significant relief. 789 F.3d at 1119.

Here, the Plaintiffs seek recovery equal to the value of the distribution, which is $900 million, jointly and severally from all Defendants, including Simonich. (Doc. 17 at 35). The Plaintiffs also seek punitive damages from all Defendants, including Simonich. (Doc. 17 at 35). Although the Plaintiffs do not seek equitable or injunctive relief from Simonich, they seek to hold him jointly and severally liable for damages up to $900 million plus punitives for his role in what the Plaintiffs allege to be a civil conspiracy and aiding and abetting tortious conduct. (Doc. 17 at ¶¶ 76-84). There is nothing in the first amended to complaint to suggest Plaintiffs claim anything but significant relief from Simonich.

**2.    Significant basis for the claims**

13

To determine whether the local defendant's alleged conduct forms a significant basis for the claims, the Court compares the allegations against the local defendant to the allegations made against the other defendants. *Benko*, 789 F.3d at 1118. In *Benko*, the Ninth Circuit cited with approval *Evans v. Walter Industries, Inc.*, in which the Eleventh Circuit reasoned the significant basis criteria was not met because the plaintiffs had not shown that "a significant number or percentage of the putative class members may have claims" against the local defendant. 789 F.3d at 1119 (citing *Evans v. Walter Industries, Inc.*, 449 F.3d 1159, 1167 (11th Cir. 2006)). The Third and Fifth Circuits, following the Eleventh Circuit's lead in *Evans*, likewise reasoned that the significant basis provision requires that the local defendant's alleged conduct affected a significant portion of the putative class. *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 156 (3rd Cir. 2009); *Opelousas General Hosp. Authority v. FairPay Solutions, Inc.*, 655 F.3d 358, 362 (5th Cir. 2011).

Here, Simonich's conduct forms a significant basis for the claims because, but for Simonich's actions, the sale and distribution could not have happened. According to the first amended complaint, Simonich was on PPL Montana's board of managers, was the highest ranking officer in PPL Montana, and was the executive in charge of the Colstrip plant. In those roles, Simonich did two things which affected the entire proposed class and without which there may be no claims

14

at all. First, Simonich, along with the other two PPL Montana managers, approved PPL Montana's sale of its hydroelectric assets to Northwestern for approximately $900 million. The sale was not possible without Simonich's approval. Second, Simonich authorized the distribution of the $900 million from PPL Montana to PPL despite knowing the distribution would leave PPL Montana insolvent. Similar to the sale of assets, the distribution was not possible without Simonich's approval. Given the proposed class's claims are premised on the unlawful sale and distribution of PPL Montana's assets, Simonich's conduct is significant under the rule articulated by *Evans*, *Kauffman*, and *Opelousas* because it caused, in part, the insolvency of PPL Montana.

Compared to other defendants, namely PPL, Simonich is probably less culpable. The first amended complaint alleges Simonich was mostly acting at PPL's direction, which by nature makes him less at fault than PPL. But it does not render his conduct insignificant. In *Coleman*, the Ninth Circuit explained that a defendant's conduct does not become insignificant when it was controlled or directed by a more culpable defendant because the lesser culpable defendant nonetheless remains personally liable for his or her own conduct. 631 F.3d at 1020. Similar reasoning applies here. Although PPL was undoubtedly the bigger player in the alleged scheme, Simonich remains liable for his own conduct, which the Plaintiffs claim is civil conspiracy and aiding and abetting tortious conduct.

Plaintiffs further claim Simonich's conduct was so egregious that he is liable for punitive damages. Most importantly, Simonich's alleged conduct—the approval of the sale and distribution knowing it would render PPL Montana insolvent—played a pivotal role in the resulting harm. The Plaintiffs therefore sufficiently allege Simonich's conduct forms a significant basis for their claims.

### C. Location of principal injuries

The Defendants argue principal injuries were not suffered in Montana because the money in both the sale and distribution was transacted in banks outside of Montana. The Defendants also argue the injury to the proposed class was not limited to Montana because slightly less than a third of the class reside outside of Montana. The Plaintiffs respond the vast majority of the harm occurred in Montana because greater than two thirds of the class reside there, including the most significant creditors.

The Court is unaware of, and neither party cites, a Ninth Circuit case interpreting the principal injuries requirement. It's unclear whether the Court is restricted to the injuries alleged in the complaint or if extrinsic evidence may be considered. Other federal district courts in the Ninth Circuit seemed to consider whether the conduct alleged in the complaint could have plausibly caused harm to people or places nationwide. *See Marino v Countrywide Financial Corp.*, 26 F.Supp.3d 949, 954-955 (C.D. Cal. 2014); *Waller v. Hewlett-Packard Co.*, 2011

WL 8601207 *4-5 (S.D. Cal. 2011); *Kearns v. Ford Motor Co.*, 2005 WL 3967998 *12 (C.D. Cal. 2005). In those cases, which each held the principal injury requirement was not met, the district courts rejected the notion that the location of the class determined the outcome and instead focused on whether the alleged harm was plausibly national in scope. For instance, in *Marino*, despite the proposed class as defined being comprised solely of Californians, the district court held the defendants' alleged conduct, which was issuing bad loans, was not restricted to California and was therefore national in scope. 26 F.Supp.3d at 954-955.

The Third Circuit took a different approach in *Kaufman*. In that case, despite the defendant's alleged conduct, which was issuing bad insurance policies nationwide, being national in scope, the Third Circuit held the principal harm was suffered in New Jersey because the proposed class as defined was comprised of only citizens of New Jersey. 561 F.3d at 158.

The legislative history indicates the federal district courts in California are more faithfully carrying out Congress's objective. The Senate Report on CAFA instructs the principal injuries requirement means "that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought . . . [the] provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct—not just where the proposed class members were injured." S. Rep. 109-14 at 38-39. The example

17

given in the Senate Report is an automobile manufacturer that sells a defective vehicle in all fifty states but the class action is brought on behalf of Floridians. S. Rep. 109-14 at 39. In that situation, according to Congress, the principal injuries requirement would not be met because principal injuries were incurred in all fifty states. S. Rep. 109-14 at 39.

The Court adopts the approach of the federal district courts in California and the Senate Report and will consider where all or almost all of the damage caused by the Defendants' conduct occurred, rather than strictly the location of the proposed class. For the reasons stated below, the Court finds most of the damage caused by the Defendants' conduct was suffered in Montana.

The nature of the harm is distinctly different from the harm suffered in *Marino*, *Waller*, *Kearns*, and the example in the Senate Report. There, the harms were the selling of defective or falsely advertised products nationwide: loans in *Marino*, hard drives in *Waller*, and vehicles in *Kearns* and in the Senate Report. Here, the harm is the Defendants defrauding mostly Montanan creditors, many of whom are employees or retirees, of a then Montana-based company. Although slightly less than a third of the proposed class are not Montana citizens, by far the most significant creditor is Montana based. According to the first amended complaint, PPL Montana owed an approximately $500 million clean up project to the Montana Department of Environmental Quality due to the Colstrip plant's ash

ponds. Whereas in *Marino*, *Waller*, *Kearns*, and the Senate Report the harm suffered by people nationwide was more or less equal, i.e., the purchase of a faulty hard drive, the bulk of the harm suffered here occurred to a single class member, which happens to be an agency of Montana's government, due to a massive clean up project regarding coal ash waste disposal on Montana soil. On top of that, the proposed class contains a significant amount of active employees and retirees that live or work in Rosebud County, far more than any other county in Montana or the nation.

The Senate Report states the purpose of CAFA's local controversy exception is "to identify a truly local controversy—a controversy that uniquely affects a particular locality to the exclusion of all others." Although some other states each have a smattering of Talen Montana creditors, the sheer amount of damage caused to Montana citizens, particularly the hundreds of employees and retirees residing in Rosebud County, and to the Montana Department of Environmental Quality makes this a controversy that "uniquely affects" Montana unlike anywhere else. To hold otherwise would cause a distinctly local issue to be transformed into a national issue, which is the opposite of CAFA's intent.

## IV. Conclusion and order

The Plaintiffs' motion to remand the case to state court (Doc. 18) is granted. This case is remanded to the Sixteenth Judicial District Court, Rosebud County, Montana.

DATED this 13th day of September, 2019.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge